UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cr. No. 20-10136-RGS-5 |
| ) | |
| ERIC DAVIS, ) | |
|     Defendant ) | |

## SENTENCING MEMORANDUM OF THE UNITED STATES

On March 25, 2008, this Court sentenced ERIC DAVIS to 71 months in custody for being a felon in possession of a firearm. On June 24, 2020, at the end of a wire investigation, law enforcement arrested DAVIS in a motel room, where they later seized approximately two kilograms of cocaine, a loaded firearm, and over $30,000 in cash.

On February 2, 2021, DAVIS pled guilty, pursuant to a C Plea Agreement with the government, to a Superseding Information, which charged him with Conspiracy to Distribute and Possess with Intent to Distribute 500 Grams or More of Cocaine and Cocaine Base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B) (Count One); and Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). The defendant's sentencing hearing is scheduled for June 9, 2021. For the reasons presented herein, in the PSR, and to be presented at the sentencing hearing, the government requests principally a sentence of 130 months' imprisonment, which is at the high end of the agreed-upon sentencing range.

## I. BACKGROUND AND THE OFFENSE

This case arose from a joint investigation by the Drug Enforcement Administration and Boston Police Department into Kenji DRAYTON, the leader of a drug trafficking organization within the Greater Boston area. Presentence Investigation Report ("PSR") ¶ 8. During the investigation, law enforcement identified DAVIS as a member of the Favre Street Gang and an

associate of the Wainwright Street Gang. In addition, investigators classified DAVIS as a "wholesale" supplier of cocaine to K. DRAYTON, WINSTON MCGHEE, and others. PSR ¶ 10.

Throughout this wire investigation, law enforcement intercepted communications which demonstrated DAVIS's varied roles in the conspiracy, including dealer, wholesale supplier, expert preparer of cocaine base, and even enforcer. For example,

- DAVIS supplied his own customers with cocaine or cocaine base, such as on June 13, 2020, when he did deals throughout the day. PSR ¶¶ 38-44.

- In turn, DAVIS was supplied with cocaine by HASSAN MONROE, including in October 2019 and February 2020. PSR ¶¶ 15-16, 23-25.

- DAVIS also turned cocaine into cocaine base for his own customers and KENJI DRAYTON, another wholesale drug supplier (who had trouble preparing cocaine base himself). For example, in August 2019, DAVIS asked K. DRAYTON for a review of the "spaghetti" that he had made; K. DRAYTON said that "[t]hat thing was all the way! Drinking, chilling, ripping, running." PSR ¶ 30. In October 2019, K. DRAYTON asked DAVIS to "come through and make your magic." PSR ¶ 31. Finally, on June 13, 2020, DAVIS told a customer that he would let him "know as soon as [he] put it together." On the same day, cell site location data showed DAVIS's phone pinging at the Homewood Suites in Canton, where investigators would later recover paraphernalia from DAVIS's room. PSR ¶¶ 40-41, 47.

- DAVIS supplied MCGHEE, as MCGHEE told K. DRAYTON that he (MCGHEE) would "ask 'Bags'", who was DAVIS.[1]  PSR ¶ 34.  Toward that end, it appears that DAVIS traveled to California in April 2020, during the early stages of the pandemic, to obtain cocaine.  MCGHEE told K. DRAYTON that "Bags is over, over, over ... on the west right now, you know what I mean?... he said he trying to get two."  At the time of the call, DAVIS's phone pinged in California.  However, the government has no evidence to confirm that DAVIS actually acquired two kilograms of cocaine in California.  PSR ¶ 37.

- Finally, on September 20, 2019, investigators intercepted calls with DAVIS which caused them to believe that DAVIS was plotting a possible shooting.  Specifically, HASSAN MONROE told DAVIS about someone who was apparently in a barbershop; DAVIS said that he was "[t]ucked in," which investigators believed meant that he was in hiding and waiting for the target to come by.  Law enforcement dispatched surveillance and marked units and no violence occurred.  PSR ¶ 14.

On June 24, 2020, the case against DAVIS culminated in his arrest and ensuing search of his hotel room.  Law enforcement first executed a search warrant at his residence, 48 Fottler Road, Mattapan, Massachusetts.  Law enforcement did not find DAVIS, but they did seize nearly $18,000 in cash, a firearm magazine, and ammunition.  PSR ¶ 45.  Then they went to the Homewood Suites Hotel in Canton and learned that a known associate of DAVIS was registered there.  They went to that room, breached the door, and found and arrested DAVIS, who was in his underwear.  They saw three cellphones and what they believed was drug paraphernalia.  DAVIS's companion also told them that DAVIS threw something.  Law enforcement froze the room.  PSR ¶¶ 46-47.

---

[1] DAVIS has a tattoo of "Money Bags" on his left wrist.  PSR ¶ 112.

Later that day, police executed a search warrant. They recovered the three cellular phones, a 9 mm pistol (likely the object that DAVIS threw), $31,547 in cash, two scales, and approximately two kilograms of cocaine. PSR ¶ 47.

## II.  GUIDELINES ANALYSIS AND CRIMINAL HISTORY

The parties in their plea agreement and the PSR applied the same Guidelines analysis. First, taking a conservative approach, DAVIS was responsible for at least two kilograms of cocaine, but not more than 3.5 kilograms, which is base offense level 26. PSR ¶ 55. DAVIS received a two level enhancement for possession of a firearm, yielding an adjusted offense level of 28. PSR ¶¶ 56, 60. DAVIS's offense level is reduced by three for acceptance of responsibility. PSR ¶ 62-63. DAVIS is therefore total offense level 25. PSR ¶ 64.

DAVIS has an extensive criminal history, including – as noted above – a prior federal conviction for possession of a firearm. In addition, DAVIS routinely violated the terms of his probation or supervised release, as noted below.

- DAVIS has several dispositions from his youth that do not score: a CWOF to youthful offender terms for use without authority in 2001; a CWOF to malicious destruction of property and threat to commit a crime (bodily harm) in 2001; and a CWOF to possession with intent to distribute Class D, also in 2001—which likely caused him to violate his probation on the two previous cases. PSR ¶¶ 68-70.

- DAVIS's first serious conviction was in 2005, for perjury and attempt to procure perjury, in connection with testimony regarding a shooting. DAVIS was sentenced to four years to four years and a day in state prison. PSR ¶ 71.

- Following that conviction, DAVIS had additional dispositions – a CWOF to possession with intent to distribute class B in 2007 and convictions for assault and battery and

4

malicious destruction of property in 2007 – that do not score.  PSR ¶¶ 72-73.  DAVIS violated his probation in the second case, likely as a result of the conduct underlying the federal case.

- In 2007, in federal court, DAVIS was charged, and later convicted, of being a felon in possession of a firearm.  In that case, an ATF CW made a controlled purchase of marijuana from DAVIS and police later stopped the car in which DAVIS was riding, recovering a firearm from under his seat (the driver was his companion in the motel room when he was arrested in 2020).  DAVIS was sentenced to 71 months in prison.  PSR ¶ 74.

- One month into his supervised release, DAVIS was arrested again for the case below, which also led to the revocation of his supervised release and a sentence of 18 months imprisonment.  After his second release from custody, he was to reside for six months at an RRC but, again within the first month, was terminated from the RRC and subsequently violated.  PSR ¶ 74.

- In 2012, DAVIS was arrested, and later convicted, of possessing a firearm, carrying a loaded firearm, and possession of a large capacity firearm.  DAVIS was sentenced to three years to three years and a day, with probation to follow.  That probation was violated and eventually terminated on July 15, 2019.[2]  PSR ¶ 75.

As demonstrated above, DAVIS has served long sentences before: state sentences of four and three years and a federal sentence of nearly six years (or over seven, with the revocation sentence included).  As a result, a lengthy sentence is warranted here, both to deter and punish him.

---

[2] The parties did not assign any criminal history points for engaging in this criminal conduct while on probation, as the PSR did, because the government does not have any evidence that DAVIS participated prior to the termination of his probation.  PSR § 77.  The parties' criminal history calculation affected the agreed-upon sentencing range, as discussed below.

## III.  18 U.S.C. §3553(a) FACTORS

In the C plea agreement, the parties proposed a range of 105 to 130 months.  In negotiating that range, they applied a criminal history category of IV.  The low end of the C plea range, 105 months, is the high end of the Guidelines range at TOL 25/CHC IV; the high end of the range, 130 months, is the low end of what the defendant's range would have been had he been convicted of the same drug charge and possessing a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c).[3]  Consideration of the §3553(a) factors demonstrates a sentence of 130 months, at the high end of the C plea range, is the appropriate sentence in this case.  Foremost among those factors are DAVIS's criminal history and the nature of this offense, trafficking in cocaine and possessing a firearm.

### A.   Characteristics of the Defendant

One unfortunate fact stands out about DAVIS's background: DAVIS has been here before and *not been deterred*.  Prior to this case, DAVIS has served three, separate multi-year sentences, including nearly six years in federal prison.  Now, at age 37, DAVIS continued to engage in criminal activity—at a larger scale, possessing a very large amount of drug, and still with a gun.

### B.   The Nature of the Offense

This case stands at the intersection of two of the most dangerous trends in our society: guns and drug trafficking.  It is hard to underestimate the dangerousness of guns, especially in the context of drug dealing and gang activity.  Of course, the government does not allege that DAVIS engaged in any specific act of violence as part of this case.  Nevertheless, he possessed that gun, which created a danger to the community.  Most gang-related murders and felonies involve illegal

---

[3] Base offense level 26, no adjustment for possession of a weapon, minus three for acceptance, yielding total offense level 23, at CHC IV, is 70 to 87 months, plus 60 months consecutive for the firearm.

guns, according to federal crime data.[4]  Illegal guns circulating among high-risk networks present a threat to the security and well-being of urban neighborhoods.  The supply of illegal guns to those embedded in high-risk networks is a critical mechanism in shaping rates of deadly violence in American cities.[5]  *See United States v. Politano*, 522 F.3d 69 (1st Cir. 2008) (in affirming above-guideline sentence in firearms trafficking case, the First Circuit noted this Court's reference to the "epidemic of handgun violence in communities within this district" and concluded that the district court "has the authority to conclude that the impact of this particular offense is more serious than that reflected by the Sentencing Commission.").

The negative impact of guns on society goes beyond death and disability.  When an individual is victimized by or exposed to gun violence, it increases the likelihood that they will be victimized again or resort to gun violence themselves.[6]  Gun homicides also can have severe economic consequences on communities.  Residents of communities impacted by gun violence experience lower property values, fewer business startups, and loss of jobs.[7]  One study estimated that surges in gun homicides slowed home value appreciation by four percent relative to communities which did not experience a surge in violence.[8]  There are further economic consequences to gunshot injuries, including the immediate hospital costs as well as the lifetime medical care costs including readmission(s) to the hospital and nursing care.  Gun violence also financially burdens survivors by diminishing wages and productivity and often results in a mental

---

[4] *Gun Violence in America*, NATIONAL INSTITUTE OF JUSTICE, (February 26, 2019), *available at*: https://nij.ojp.gov/topics/articles/gun-violence-america
[5] *Supra* note 4
[6] *A Nation of Survivors: The Toll of Gun Violence in America*, EVERYTOWN FOR GUN SAFETY , (February 1, 2019), *available at*: https://everytownresearch.org/reports/nationofsurvivors/
[7] *Id*.
[8] *Id*.

or physical disability. One study estimates the overall societal cost for each gun-related assault at $1.2 million.[9]

DAVIS combined his dangerous possession of a firearm with trafficking cocaine, a very dangerous controlled substance. Powdered cocaine accounts for the second-most trafficked drug today.[10] As the Court is aware, cocaine usage may induce serious physiological complications immediately or shortly after use. "Some of the most frequent are cardiovascular effects, including disturbances in heart rhythm and heart attacks; neurological effects, including headaches, seizures, strokes, and coma; and gastrointestinal complications, including abdominal pain and nausea. . . . Cocaine-related deaths are often a result of cardiac arrest or seizures."[11] These effects are particularly dangerous when combined with other depressants such as alcohol or heroin. Each can be toxic or induce overdose, given the offsetting nature of combining a stimulant with a depressant.[12]

The high potentiality of cocaine overdoses is not merely theoretical, it represents a reality that is plaguing this country.[13] Between the years 2009 and 2013, overdoses involving cocaine

---

[9] *Id*.

[10] *Quick Facts: Drug Trafficking Offenses*, UNITED STATES SENTENCING COMMISSION (June 2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Drug_Trafficking_FY19.pdf.

[11] *Cocaine Research Report: What are the short-term effects of cocaine use?*, NATIONAL INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-short-term-effects-cocaine-use (last visited Feb. 19, 2021).

[12] *Id.*

[13] The CDC has not yet published related information from the 2019 or 2020. Thus, in the data that follows, 2018 represents the most recent data available.

were relatively stable.[14]  However, cocaine overdoses nearly tripled between 2013 and 2018.[15] This represents a 27 percent year over year increase in cocaine overdoses.[16]  "In 2018 [alone], there were 14,666 drug overdose deaths involving cocaine in the United States for an age-adjusted rate of 4.5 per 100,000 standard population."[17]  Moreover, "rates increased between 2009 and 2018 for all age groups."[18]



Perhaps most crucially, cocaine is often combined with opioids.  This is significantly more deadly than cocaine without opioid involvement.  As alluded earlier, the combination of a

---

[14] Holly Hedegaard, et al., *Increase in Drug Overdose Deaths Involving Cocaine: United States, 2009–2018*, CENTERS FOR DISEASE CONTROL AND PREVENTION NCHS DATA BRIEF NO. 384, 1, 1 (Oct. 2020), https://www.cdc.gov/nchs/data/databriefs/db384-H.pdf.
[15] *Id.* at 1.
[16] *Id.* at 1.
[17] *Id.* at 1.
[18] *Id.* at 2.

stimulant with a depressant dramatically increases the potentiality of overdose.[19]  Because the effects of cocaine are offset by the sedation of an opioid such as heroin, one may end up taking a higher dosage of the opioid without realizing it, inevitably leading to overdose.[20]  Furthermore, "because cocaine's effects wear off sooner, this can lead to a heroin overdose, in which the user's respiration dangerously slows down or stops, possibly fatally."[21]

Analogous to the tripling of cocaine related overdoses during the relevant period of 2013 through 2018, "drug overdose deaths involving cocaine with concurrent involvement of opioids, the rate remained stable from 2009 through 2013 ranging from 0.7 to 0.9 per 100,000."[22]  However, this rate *more than tripled* to 3.4 deaths per 100,000 in 2018.[23]  Given the opioid epidemic affecting the Commonwealth and the country writ large, this dramatic increase in deaths is particularly troubling, as it demonstrates the large number of people that may be at risk.

Even not counting opioid usage, which is difficult considering its ubiquity among substance abusers, deaths from cocaine alone (i.e. independent of opioid involvement) are also on the rise.  Once again, deaths involving cocaine with no opioid remained constant throughout the period of 2009 through 2014.  Since 2014, deaths have nearly doubled, increasing to 1.1 per 100,000 in 2018.[24]

---

[19] *See supra* note **Error! Bookmark not defined.**.
[20] *See supra* note **Error! Bookmark not defined.**.
[21] *Supra* note **Error! Bookmark not defined.**.
[22] Hedegaard, et al., *supra* note 14, at 4.
[23] Hedegaard, et al., *supra* note 14, at 4.
[24] Hedegaard, et al., *supra* note 14, at 4.



Figure 4. Age-adjusted rates of drug overdose deaths involving cocaine, by concurrent involvement of opioids: United States, 2009–2018

In total, Massachusetts ranks within the top ten states for drug overdose mortality.[25]

It is clear that these crimes are serious and the government has a strong interest in punishing DAVIS and deterring others from committing them.  In fact, the government has a particularly strong interest in regulating both firearm possession and cocaine distribution as part of its effort to promote safety generally and reduce the risks of drug abuse specifically.  Accordingly, the sentence requested here, while no doubt long, is appropriate here.

---

[25] *Drug Overdose Morality by State*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm.

## IV.  THE GOVERNMENT'S RECOMMENDATION

For the foregoing reasons, those contained in the PSR and those to be presented at the sentencing hearing, the government requests the following sentence:

- a term of 130 months' imprisonment;
- no fine;
- a term of 48 months' supervised release, with the conditions set forth at pp. 45-46 of the PSR;
- a special assessment of $200; and
- forfeiture as requested in the government's motion for forfeiture [Dkt. No. 340].[26]

Respectfully submitted,

NATHANIEL R. MENDELL
ACTING UNITED STATES ATTORNEY

By:  s/ Timothy E. Moran
     TIMOTHY E. MORAN
     KAITLIN O'DONNELL
     Assistant U.S. Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

s/ Timothy E. Moran
TIMOTHY E. MORAN

Date: June 7, 2021

---

[26] The order of forfeiture would forfeit DAVIS's interest in the seized money.  The government understands that DAVIS's relatives may submit claims to some of the funds.